IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-340

Filed 21 May 2024

Orange County, No. 21 CRS 51423

STATE OF NORTH CAROLINA

v.

JOSEPH JOHN RADOMSKI, III, Defendant.

Appeal by Defendant from judgment entered 7 September 2022 by Judge Craig Croom in Orange County Superior Court. Heard in the Court of Appeals 10 January 2024.

*Attorney General Joshua H. Stein, by Solicitor General Ryan Y. Park, Deputy Solicitor General Lindsay Vance Smith, and Solicitor General Fellow Mary Elizabeth D. Reed, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Heidi Reiner, for defendant-appellant.*

MURPHY, Judge.

When the application of a statute impedes conduct protected by the plain text of the Second Amendment, it is presumptively unconstitutional. To overcome this presumption, the State must demonstrate that its regulation is consistent with, or analogous to, this Nation's historical tradition of firearm regulation. The State failed to demonstrate that regulating Defendant's possession of firearms, which were kept within a vehicle that was parked in the university hospital parking lot where Defendant was seeking emergency medical care, is consistent with this Nation's

historical tradition of firearm regulation. As an alternative ground for reversal, the State failed to present substantial evidence that Defendant knowingly possessed a firearm on educational property.

## BACKGROUND

On 15 June 2021, Defendant drove his motorized vehicle to the University of North Carolina Hospital ("UNC Hospital") for treatment related to a temporary kidney shunt. At this time, Defendant was otherwise homeless and living in his vehicle. As such, all of his personal belongings were inside of the vehicle's back cargo area. Defendant parked in the open-air lot nearest the Taylor Campus Health building—Crescent Lot—in a spot designated as handicapped parking.

Around or about 6:00 a.m., Officer Glenn Powell, a police officer with the UNC Chapel Hill Campus Police Department, received a call from UNC Hospital reporting a suspicious vehicle located in Crescent Lot. After making contact with hospital staff, Officer Powell approached Defendant's vehicle and spoke to its occupant, Defendant. Officer Powell observed that Defendant's vehicle did not have any license plate affixed to it and ran the vehicle's information, upon which Officer Powell learned that Defendant's vehicle had no insurance coverage. Officer Powell questioned Defendant about the vehicle's contents, specifically asking if there were any items in the vehicle which he needed to know about, such as weapons. After a few responses to the contrary, Defendant stated there were firearms inside of the vehicle. At this time,

Officer Powell asked Defendant to exit the vehicle. Throughout this interaction, Defendant expressed that he had been unaware he was on educational property.

Officer Powell placed Defendant in handcuffs while he searched the vehicle. Defendant assisted Officer Powell in locating the firearms, and he retrieved a series of firearms from the backseat. Officer Powell recovered an SKS black semi-automatic rifle, a magazine with several rounds of ammunition, several other semi-automatic rifles, and a Winchester 1400 shotgun, totaling to 6 long guns. Each of these guns was stored in or between a soft case without any trigger locks or other safeties. Officer Powell then placed Defendant under arrest for possession of a firearm on educational property.

On 1 November 2021, Defendant was indicted on one count of possession of a firearm on educational property in connection with the SKS black semi-automatic rifle and its magazine. On 6 September 2022, Defendant's jury trial began, and the next day, the jury returned a guilty verdict. The trial court ordered Defendant's sentence of 5 to 15 months to be suspended, and Defendant was placed on 12 months of supervised probation. Defendant appealed.

## ANALYSIS

Defendant contends that his judgment should be vacated because (A) the statute under which Defendant was convicted is unconstitutional, both facially and as-applied to the facts of his case, (B) the trial court erred by denying his motion to dismiss for lack of sufficient evidence, and (C) the trial court erred by failing to

intervene *ex mero motu* in the State's improper closing argument. We hold that the application of N.C.G.S. § 14-269.2(b) to Defendant's case, where Defendant's vehicle was parked in a parking lot of the university hospital where he sought treatment and his firearms remained within the vehicle, is unconstitutional. As an alternative ground, we hold that the trial court erred by denying Defendant's motion to dismiss for lack of sufficient evidence. We reverse the trial court's denial of Defendant's motion to dismiss, vacate Defendant's conviction, and dismiss each of Defendant's other contentions of error as moot.

## A. Constitutionality

First, Defendant argues that N.C.G.S. § 14-269.2(b) is facially unconstitutional, as it impermissibly "burdens conduct protected by the Second Amendment[.]" In the alternative, Defendant argues that the statute is unconstitutional as-applied to the circumstances of his case.

"A party making a facial challenge must establish that a law is unconstitutional in all of its applications. In contrast, the determination whether a statute is unconstitutional as applied is strongly influenced by the facts in a particular case." *State v. Grady*, 372 N.C. 509, 522 (2019). "When confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force or to sever its problematic portions while leaving the remainder intact." *Id.* at 549 (quoting *Ayotte v. Planned Parenthood of N. New*

- 4 -

*England*, 546 U.S. 320, 328-29 (2006)) (cleaned up).  As we conclude that the statute is unconstitutional as-applied to Defendant's circumstances, we do not address Defendant's facial challenge.

**1. Rule 2**

Defendant acknowledges that he failed to raise these constitutional arguments at trial, and, therefore, they are unpreserved.  N.C. R. App. P. 10 (2023).  "Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal, not even for plain error[.]"  *State v. Gobal*, 186 N.C. App. 308, 320 (2007) (citations omitted), *aff'd*, 362 N.C. 342 (2008).

Defendant, however, "respectfully requests [that] this Court exercise its discretionary authority under Rule 2 to waive Rule 10's preservation requirements and address his constitutional arguments."  Rule 2 permits an appellate court to "suspend or vary the requirements or provisions of any [Rules of Appellate Procedure] in a case pending before it upon application of a party or upon its own initiative" "[t]o prevent manifest injustice to a party, or to expedite decision in the public interest[.]"  N.C. R. App. P. 2 (2023).  In support of his request for review under Rule 2, Defendant asserts that, in light of the United States Supreme Court's recent opinion in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), "the trial court's decision to enter a judgment against [Defendant] pursuant to a statute that criminalizes constitutionally protected actions constitutes a 'manifest injustice' this

Court can correct and prevent by invoking Rule 2."[1]  Defendant further argues that review of his case pursuant to Rule 2 "is warranted in the public interest" because the constitutional issues presented are part of a "newly percolating and widely occurring issue[.]"

Defendant also seeks our review of the constitutional issues in a contemporaneously filed *Motion for Appropriate Relief*.  We first address Defendant's MAR.  "When a motion for appropriate relief is made in the appellate division, the appellate court must decide whether the motion may be determined on the basis of the materials before it . . . . If the appellate court does not remand the case for proceedings on the motion, it may determine the motion in conjunction with the appeal and enter its own ruling on the motion with its determination of the case." N.C.G.S. § 15A-1418(b) (2023).  We recently declined to address a defendant's unpreserved constitutional argument pursuant to a MAR in *State v. Stokes*, 289 N.C. App. 631 (2023) (unpublished) (citing *Gobal*, 186 N.C. App. at 320) ("As an initial matter, we note that although [the] defendant attempts to address the constitutionality of [the statute] through a MAR filed separately with this Court and by referencing the MAR briefly in his brief, this issue was not preserved.  Therefore, we will not address it as a part of [the] defendant's appeal.").  Although it is a non-

---

[1] We note that *Bruen* was decided by the United States Supreme Court on 23 June 2022, only 76 days before the jury's verdict was returned on 7 September 2022.

precedential decision, we apply the same logic as in *Stokes* and deny Defendant's MAR by separate order.

Thus, whether we review Defendant's constitutional argument depends on whether the circumstances support a decision to invoke Rule 2; that is, we must determine whether invoking Rule 2 to permit our review of the unpreserved constitutional issues is necessary "[t]o prevent manifest injustice to a party, or to expedite decision in the public interest[.]" N.C. R. App. P. 2 (2023). Although the State argues that Defendant failed to show that either of these circumstances exist, we are satisfied by Defendant's argument that, due to the proximity of his case to *Bruen* and to the "newly percolating and widely occurring issue" presented in this case, invoking Rule 2 is appropriate under both of the articulated grounds. Thus, we proceed to consider the merits of Defendant's constitutional argument.

**2. As-Applied Challenge**

"An as-applied challenge represents a party's protest against how a statute was applied in the particular context in which the party acted . . . ." *Lakins v. W. N.C. Conf. of United Methodist Church*, 283 N.C. App. 385, 393 (2022) (cleaned up). N.C.G.S. § 14-269.2(b) reads as follows:

> It shall be a Class I felony for any person knowingly to possess or carry, whether openly or concealed, any gun, rifle, pistol, or other firearm of any kind on educational property or to a curricular or extracurricular activity sponsored by a school . . . .

N.C.G.S. § 14-269.2(b) (2023).

Defendant contends that application of N.C.G.S. § 14-269.2(b) to the facts of his case is unconstitutional, as "[Defendant's] possession of an unloaded rifle and ammunition in a UNC hospital parking lot in his car, which was both his home and the means by which he traveled to the hospital for treatment, unquestionably falls within the purview of the Second Amendment." Defendant argues that "[t]wo factors, independently and collectively, demonstrate why application of N.C.G.S. § 14-269.2(b) to [his] case was unconstitutional[]": (1) the places protected by the statute, "campus or other educational property[,]" N.C.G.S. § 14-269.2(b) (2023), "cannot be fairly understood to encompass a parking lot near a hospital that happens to be affiliated with a nearby university[,]" as this would "severely curtail[] [Defendant's] right to possess and bear arms . . . in numerous places not historically understood to be sensitive places in violation of his Second Amendment rights and the United States Supreme Court's decision in *Bruen*" and (2) the "central component" of the Second Amendment, "self-defense[,]" *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008), is not forfeited by Defendant's "being unhoused in the traditional sense[,]" as the "right [to bear arms] follows individuals outside of their homes into the areas where they are more likely to need protection, including public parking lots," and to prohibit Defendant's conduct under these circumstances would "force[] [Defendant] to surrender his personal property and suffer a felony criminal conviction for exercising his Second Amendment rights while experiencing housing insecurity." We note Defendant's concerns regarding the equal protection of an individual's Second

Amendment rights while experiencing homelessness, though we hold that the statute is unconstitutional as applied due to the non-sensitive nature of the parking lot and need not address whether the statute is unconstitutional as applied due to Defendant's status as a homeless person living in his car.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* Thus, the State bears the burden to show that prohibiting Defendant's conduct under N.C.G.S. § 14-269.2(b) "is consistent with [this] Nation's historical tradition of firearm regulation." *Id.* We hold that the State fails to meet this burden.

The U.S. Supreme Court held in *Bruen*:

> To determine whether a firearm regulation is consistent with the Second Amendment, *Heller* and *McDonald* point toward at least two relevant metrics: first, whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether that regulatory burden is comparably justified.
>
> . . . .
>
> To be clear, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. For example, courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible. That said, respondents' attempt to characterize New York's proper-

> cause requirement as a "sensitive-place" law lacks merit because there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

*Id.* at 3 (citations omitted).

First, the State argues that N.C.G.S. § 14-269.2(b), as applied to the facts of Defendant's case, is constitutional under *Bruen*'s "enthusiastic" holding that "laws forbidding the carrying of firearms in sensitive places such as schools" are constitutional. However, Defendant argues, and we agree, that the purpose of the "open-air parking lot situated between the emergency room entrance, a football arena, and another healthcare building[]" is not educational in nature; rather, its function is to provide "parking access to the health care facilities in the area, including the hospital where [Defendant] was trying to be seen for significant kidney health concerns." Therefore, we disregard the State's argument that N.C.G.S. § 14-269.2(b), as applied to the facts of Defendant's case, merely forbids the carrying of firearms in an "obvious, undisputed, and uncontroversial[]" "gun-free [school] zone[][.]" *See Siegel v. Platkin*, 653 F.Supp.3d 136, 151 (D.N.J. 2023) (citation and marks omitted) ("In *Bruen* and *Heller*, the [U.S.] Supreme Court expressly identified restrictions at certain sensitive places (such as schools) to be well-settled, even though the 18th-and 19th-century evidence has revealed few categories in number. The inference, the Court suggested, is that some gun-free zones are simply obvious, undisputed, and uncontroversial."); *see also Bruen*, 597 U.S. at 3 (citation and marks

omitted) ("To be clear, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. For example, courts can use analogies to longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings to determine whether modern regulations are constitutionally permissible.").

In the alternative, the State argues that, "even applying *Bruen*'s analogical test, [N.C.G.S. § 14-269.2(b)] easily passes constitutional review." The State contends that prohibiting Defendant's possession of a firearm in the parking lot adjacent to the UNC hospital is constitutional as a "modern regulation[] that [was] unimaginable at the founding [of the U.S.]" but analogous enough to "[h]istorical sensitive-place restrictions, [which] barred firearms where people gathered to engage in important activities where firearms could be particularly disruptive" such as "legislative assemblies, polling places, and courthouses[]" to pass constitutional muster. *Bruen*, 597 U.S. at 28, 30. We disagree.

Defendant argues that, although hospitals are often "owned by or otherwise affiliated with colleges and universities[]" due to "[t]he financial and practical realities of modern-day medical administration[,]" "[c]olleges and universities are frequently large landowners[]" and "[t]his affiliation alone[] . . . cannot bring those facilities or the parking lots outside them into the purview of [N.C.G.S. § 14-269.2(b)] without running afoul of the Second Amendment." Defendant emphasizes that, although Officer Powell testified that the hospital is "immediately in the vicinity[,] .

. . engulfed by [] campus, [and] . . . considered part of campus[,]" he also testified that it is policed separately by the UNC Hospital Police Department. Defendant further contends, and we agree, that the mere nature of being "in an[] area where there are" "various signs . . . either in Carolina Blue or otherwise saying UNC" does not in and of itself render the parking lot to be fairly and constitutionally included within the statutory language of N.C.G.S. § 14-269.2(b), and "[a]ny conception of N.C.G.S. § 14-269.2[(b)] that folds in any area where there are such signs reads 'campus' far too broadly[]" for the purposes of a sensitive-place restriction. To restrict Defendant's Second Amendment right pursuant to N.C.G.S. § 14-269.2(b) under these facts, where the firearms remained within his vehicle in the parking lot of the hospital where he had gone to seek medical treatment, would be unconstitutional.

## B. Motion to Dismiss

Next, Defendant argues that the trial court erred by denying his motion to dismiss because the State failed to present substantial evidence of each element of the charged offense. Defendant argues that the State failed to present substantial evidence both that Defendant *was on* educational property, as defined by the statute, and that Defendant *knew* he was on educational property.

> "In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Winkler*, 368 N.C. 572, 574 (2015) (quoting *State v. Mann*, 355 N.C. 294, 301 (2002)). "Substantial evidence is [the] amount necessary to persuade a rational juror to accept a conclusion." *Id.*

(quoting *Mann*, 355 N.C. at 301). In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered "in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom." *Id.* (quoting *State v. Powell*, 299 N.C. 95, 99 (1980)). In other words, if the record developed at trial contains "substantial evidence, whether direct or circumstantial, or a combination, 'to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.'" *Id.* at 575 (quoting *State v. Locklear*, 322 N.C. 349, 358 (1988)). "Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *State v. Chekanow*, 370 N.C. 488, 492 (2018) (quoting [*State v. Crockett*, 368 N.C. 717, 720 (2016)]).

*State v. Golder*, 374 N.C. 238, 249-50 (2020) (cleaned up).

**1. Educational Property**

The term "educational property[,]" as used in N.C.G.S. § 14-269.2(b), refers to "[a]ny school building or bus, school campus, grounds, recreational area, athletic field, or other property owned, used, or operated by any board of education or school board of trustees, or directors for the administration of any school." N.C.G.S. § 14-269.2(a)(1) (2023). Defendant argues that this definition of "educational property" does not apply to Crescent Lot because it is not used "for the administration of any school." *Id.* According to Defendant,

> [t]he lot was situated between a football field, a health center, and the emergency room entrance of a hospital . . . . The plain and strict understanding of this statute should not include a public parking lot unrelated to the

- 13 -

educational administration at the university. Rather, it would include the spaces the general public would think of when hearing about this statute—college and school classrooms and hallways—and the scenarios they would call to mind—someone carrying firearms on their person through a school building with nefarious intent. The State's only evidence, instead, showed [Defendant] was in a parking lot adjacent to the hospital at which he was seeking care.

Despite Defendant's contentions to the contrary, a plain reading of the statute does not require that *all* "educational property" be "owned, used, or operated . . . for the administration of any school." *Id.* Rather, only those "other propert[ies]" which do not fall within the earlier categories, "[a]ny school building or bus, school campus, grounds, recreational area, [or] athletic field," must be "owned, used, or operated . . . for the administration of any school." N.C.G.S. § 14-269.2(a)(1) (2023). Even if we accepted Defendant's proposed reading of the statute requiring each of the enumerated items to be "owned, used, or operated . . . for the administration of any school[,]" such a reading would lend itself to absurd results. *Id.*; *see C Invs. 2, LLC v. Auger*, 277 N.C. App. 420, 430 (2021) (citing *Mazda Motors of Am., Inc. v. Sw. Motors, Inc.*, 296 N.C. 237, 361 (1979)), *aff'd*, 383 N.C. 1 (2022) ("Now, to be sure, if the plain reading of a statute leads to a result so absurd that no reasonable legislator could have intended it, we can ignore that absurd interpretation and find a reasonable one."). For example, to fall within this statute's protections, any school buses or athletic fields would need to be "owned, used, or operated" for administrative purposes. Giving the State the benefit of "every reasonable inference" from the

evidence, Defendant's car was located on the UNC Chapel Hill Campus. *See Golder*, 374 N.C. at 249-50 ("In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom."). The UNC Chapel Hill Campus squarely falls within the enumerated categories in N.C.G.S. § 14-269.2(a)(1). Defendant's attempt to suggest that the parking lot itself, located on the UNC Chapel Hill Campus, must be used "for the administration of [the] school" fails. The State presented sufficient, substantial evidence that Defendant was on educational property as defined by the statute. However, as we discuss below, the trial court erred by denying Defendant's motion to dismiss because the State failed to present substantial evidence that Defendant *knew* he was on educational property.

**2. Knowledge**

Pursuant to N.C.G.S. § 14-269.2(b), a person commits a felony when he "*knowingly* [] possess[es] or carr[ies] . . . any . . . firearm of any kind on educational property . . . ." N.C.G.S. § 14-269.2(b) (2023). Defendant's knowledge that he possessed the firearm on educational property is an essential element of the crime, and, therefore, the State was required to present substantial evidence of such knowledge.

To support this element of the offense, the State offered Officer Powell's testimony regarding the events during Defendant's arrest and the seven possible

paths by which Defendant could have reached the parking lot. Officer Powell testified that he and Defendant "spoke about" whether he was aware he was on educational property "on and off[,]" that "[a]t one point . . . [Defendant] said that he always forgot that the hospital was on UNC's campus[,]" and that Defendant mentioned he was unaware that he was on educational property "several times throughout [their] encounter." Officer Powell also testified that "there was not a sign where [Defendant's] vehicle was actually located that indicated [Defendant] was on campus property[,]" nor was there "a sign that indicated you could not possess weapons where his vehicle was actually located[.]"

Officer Powell further testified as to why he arrested Defendant:

> At that point, viewing the totality of the circumstances, I looked at where we were located, our vicinity to Taylor Campus Health with its sign, the Taylor Campus Health hanging sign that's nearby the vehicle; Gate 6 being within eyeshot, which is part of Kenan Stadium, the large football stadium that UNC football plays at. I determined that based on the totality of the circumstances that there was no way that any reasonable person would not recognize the area as part of campus, that he was -- that there were firearms in the possession of [Defendant], ammunition, and they were not secured. So I determined at this point that I was going to place [Defendant] under arrest for felony possession of a firearm on educational property.

Officer Powell's testimony explicitly indicates that Defendant expressed numerous times that he was unaware he was on educational property, but that Officer Powell arrested him based on his belief "that there was no way that any reasonable person would not recognize the area as part of campus . . . ." Officer Powell also testified

that "everything on campus is very clearly labeled so that any layperson with limited familiarity can navigate campus effectively[]" and that "[t]here is a hanging sign for Taylor Campus Health . . . [which] would have been immediately to the left of the vehicle's front headlight at an angle where it would be within your line of sight." Notably, at no point did Officer Powell testify that he had any further reasons, specific to Defendant, to believe that Defendant knew he was on educational property.

The State also questioned Officer Powell about the number of means by which Defendant could have reached the parking lot in his vehicle. The exchange between the State and Officer Powell was as follows:

> [OFFICER POWELL:] If you are coming from Highway 54 area and you are turning onto the eastern part of Manning Drive, heading from Manning Drive up toward Ridge Road, Skipper Bowles vicinity.
>
> [THE STATE:] Okay. Along that path . . . is there any signage that references the . . . legality of possessing firearms?
>
> [OFFICER POWELL:] There is one sign.
>
> [THE STATE:] Okay. What does it say?
>
> [OFFICER POWELL:] "No weapons on educational property."
>
> [THE STATE:] Okay. So that's . . . one path. Are there any other paths that someone could take to get to where he was?
>
> [OFFICER POWELL:] Yes, sir. There's a few other paths.
>
> [THE STATE:] Okay. Tell us about them.

[OFFICER POWELL:] So in the same vicinity as you are cutting through Carrboro, you can take an offshoot to pick up 15/501 over South Columbia. That labels the area heading toward the hospital and the university with a street sign which will have you riding on South Columbia until you pick up the western part of Manning Drive. That's in the vicinity of Pittsboro Street. You would turn right there and then follow the road past the hospital, past Cardinal Deck, past the Dogwood Deck, going past East and West Drive as well as the dental school, Koury.

. . . .

[THE STATE:] Once you get onto campus, all the signs switch from the normal green that you are used to seeing in regular areas to the Carolina blue color. They have an Old Well or . . . the Carolina NC stamp that is familiar and commonly used for sporting occasions. And then the large parking structures, all the buildings along that, past Mary Ellen Jones as well, the cancer research, have black signs with white letters and either the Old Well or some other University-affiliated emblem on the signage in a light blue color.

. . . .

You can use South Road as well. So without describing how to get completely to South Road from the various points . . . . [Y]ou either have to come up from Raleigh Road where it turns into South Road and there's a "Welcome to UNC" sign where you would turn left onto County Club and then turn right down Ridge Road going past the School of Government and the law school, Van Hecke-Wettach, which are both clearly labeled.

. . . .

So then you would proceed down Ridge Road, past that point, the football indoor practice facility; and on the left would be Boshamer Baseball Stadium.

. . . .

And then from there you have two options on how to get where [Defendant] was located. Most people would continue straight down Ridge Road until it hits Manning Drive, going past SASP South and North. It's the administrative buildings where payoffs and things like that are located; clear signage there as well. You would turn right onto Manning Drive, go past Hardin Dorm, which has a sign as well as for Morrison Dorm, which would be on your right-hand side.

On your left side you go past Craige and Craige North. Craige North being the closest to the road, and there's a sign for that as well. Go past Paul Hardin Drive where the public safety building is located as well as our P2P, which has buses and bus stops in the vicinity. And then you would turn right onto Emergency Room Drive. Follow that past the emergency room, up toward Gate 6; and then when you face Gate 6, you would turn to the left, and that would take you to the handicapped spot by Taylor Campus Health, which is where [Defendant's] vehicle was located in.

The other way would be right in the same vicinity of Boshamer Stadium. There is a Rams Head parking deck. If you turn right, there's a tunnel. You go through that tunnel, go down past the entrance -- visiting team entrance gates for the football team, up a hill; and it will put you right at Gate 6 at Kenan Stadium. This is not an area where most people are familiar with or allowed to drive on; however, people do it fairly regularly if they are familiar with the area. You would pop up literally at Gate 6. It's meant for deliveries and things like that, and honestly, the football team's golf carts and things like that and emergency vehicles. And emergency vehicles use it all the time.

So you would pop up at Gate 6 where it would be clearly labeled as Gate 6 of Kenan Stadium, and you would go to

the left and then turn right immediately. And that would put you in that same vicinity at Taylor Campus Health.

. . . .

Going from the opposite direction of South Road, coming from South Columbia Street, you would go down past the Bell Tower, past Bell Tower Drive, past the Stone Center in the same vicinity as the student stores and Wilson Library, Kenan Laboratory area, all labeled in the same fashion with the white letters, the black sign, and the Carolina blue logo with either an Old Well or some other affiliated symbol.

You would turn right onto Stadium Drive, go past Gates 1, 2, and 3 of the Kenan Stadium as well as Carmichael, Parker, Teague; and then Avery is where you pick up at Ridge Road. And then you would turn right down there from Stadium Drive. You can still see the same, like, vicinity as Boshamer Stadium. And then from there you would either take the back route I referenced earlier, cutting through to Gate 6, or the main route of Ridge Road to Manning Drive.

[THE STATE:] Okay. Now have we covered all the ingress and egress?

. . . .

[OFFICER POWELL:] Yes, sir.

Defendant argues that "there was no evidence whatsoever that [Defendant], while sick and seeking emergency medical care, visually saw and mentally took in or understood those signs such that he *knew* he was on educational property as required under N.C.G.S. § 14-269.2(b)[,]" and "[t]here was no evidence which of the seven roads [Defendant] took into the parking lot." Defendant contends, and we agree, that

"[d]riving past signs that may be blue or say UNC is not the same as knowingly being on campus."

Our Supreme Court has held that

> [t]here is no logical reason why an inference which naturally arises from a *fact proven by circumstantial evidence* may not be made. Therefore, it is appropriate for a jury to make inferences on inferences when determining whether the facts constitute the elements of the crime. Thus, circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence.

*State v. Dover*, 381 N.C. 535, 547 (2022) (cleaned up) (emphasis added). However, "[a] motion to dismiss should be granted . . . when the facts and circumstances warranted by the evidence do no more than raise a suspicion of guilt or conjecture since there would still remain a reasonable doubt as to [the] defendant's guilt." *State v. Simpson*, 235 N.C. App. 398, 403-04 (2014) (quoting *State v. McDowell*, 217 N.C. App. 634, 636 (2011)).

The State failed to present any evidence, direct or circumstantial, as to which path Defendant took, what signs he saw, or any other indication of personal knowledge that he was on educational property. The State did not "prove[] by circumstantial evidence" any fact from which the jury could infer Defendant's knowledge, and the jury was left only to speculate as to Defendant's mens rea at the time of the actus reus. *See Dover*, 381 N.C. at 547. The trial court erred in denying Defendant's motion to dismiss, as "the facts and circumstances warranted by the

[State's] evidence [did] no more than raise a suspicion of guilt or conjecture[,]" and "a reasonable doubt as to [Defendant's] guilt[]" remained. *See Simpson*, 235 N.C. at 403-04.

## CONCLUSION

The application of N.C.G.S. § 14-269.2(b) to Defendant's conduct under these facts unconstitutionally restricts Defendant's Second Amendment protections. Furthermore, the State failed to demonstrate that Defendant knew he possessed a firearm on educational grounds. We reverse the trial court's denial of Defendant's motion to dismiss and vacate Defendant's conviction.

REVERSED AND VACATED.

Judge CARPENTER concurs.

Chief Judge DILLON concurs in a separate opinion.

No. COA23-304 – *State v. Radomski*


DILLON, Chief Judge, concurring.

I agree in the majority opinion that the gun possession statute under which Defendant was convicted is unconstitutional as applied to him in this case. The evidence shows that Defendant is homeless; that everything in the world he owns, including his firearm, was in his car; and that he drove his car to UNC Hospital to seek emergency medical attention. There was no evidence that Defendant had the opportunity or means to store his firearm before proceeding to the hospital.

I do not agree with the majority's conclusion that there was insufficient evidence that Defendant knew that he was on educational property. Indeed, there was evidence that Defendant would have passed signs indicating that he was on UNC's campus. He was near Kenan Stadium, where UNC plays its home football games. The officer testified that Defendant told him that he "always forgot" that the hospital was on UNC's campus, suggesting that he has been there and/or at least was admitting that had known at some point in the past that the hospital was on UNC's campus. One cannot forget what he did not once know. But, further, it may be that the jury simply did not believe Defendant's statement that he forgot what he admitted he once knew, that the hospital was on UNC's campus. In sum, I conclude the State presented enough evidence from which the jury could find that Defendant knew he was on educational property.